**UNITED STATES of America,**

v.

**Alfred G. MILLER, Defendant.**

**No. 03 CR. 1380(LAK).**

United States District Court,
S.D. New York.

Feb. 23, 2004.

---

17. *Id.*

Sarah Y. Lai, Assistant United States Attorney, David N. Kelley, United States Attorney, New York City, for Plaintiff.

Leonard F. Joy, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Defendant Alfred .G. Miller, who was indicted for being a felon in possession of firearms, moved to suppress physical evidence and a custodial statement that he alleges were obtained in violation of the Fourth Amendment when police officers recovered from his residence two guns found while officers were present assisting with an order of protection. The Court held an evidentiary hearing on January 30, 2004 and denied the motion on February 23, 2004 just prior to the start of the trial.[1] This memorandum opinion explains the basis for that decision.

### Facts

In September 2003, Miller resided in a Bronx apartment with his cousin, Kendu Newkirk. The two had a disagreement in consequence of which Newkirk obtained an order of protection ("OP") against Miller from the Family Court of the State of New York, Bronx County.[2]

On September 23, 2003, New York City police officers Vidal and Sanchez were assigned to assist Newkirk in serving the order, the terms of which allowed Newkirk to retrieve personal belongings from the apartment. Before leaving the precinct house for the apartment, Newkirk told the officers that he had obtained the OP because Miller "was threatening him" and

---

1. Miller then waived a jury and was tried on stipulated facts and found guilty.

2. Hearing Transcript ("Tr.") 7, 10.

had told Newkirk "he was going to kick his ass and put a bullet through his head." [3] The three proceeded to the apartment where they found Miller and his girl friend. The officers explained their business and asked them to wait in the living room, which was immediately adjacent to the apartment door.[4] Newkirk then proceeded to gather his belongings. At some point, he entered the bedroom in the rear of the apartment, and Vidal followed him into the room.[5] Moments later, Newkirk left the bedroom, followed by Vidal, and returned to the front of or left the apartment, leaving Vidal in the hallway in front of the door to the rear bedroom and Sanchez somewhere between the door to the living room and the door to the rear bedroom.[6] Miller then came out of the living room into the hall and asked Vidal if he could go into the rear bedroom to retrieve "some stuff." [7] Vidal agreed, allowed Miller to pass, and then followed him into the room. He explained at the hearing that he did so "for safety." [8] Miller remained in the room only briefly. After he left, however, Vidal glanced at a closet on the left side of the room, the door to which had been left open, and noticed a shotgun in plain view.[9] In response to questioning, Miller admitted to having another firearm and turned it over. After being placed under arrest, Miller acknowledged possession of the two firearms.

Miller contends that the shotgun was discovered as a result of an unlawful search and that his admission of possession of the shotgun and the other firearm were fruits of that illegality. Many of the facts concerning the circumstances were disputed, but the foregoing constitute the Court's findings as to what occurred. In view of those findings, the legality of the search turns entirely on whether Officer Vidal's presence in the rear bedroom at the time he discovered the shotgun was lawful.

*Discussion*

▮ The Fourth Amendment bars only unreasonable searches and seizures, reasonableness being its "central requirement." [10] A warrantless search of a residence is " 'per se unreasonable under the Forth Amendment—subject only to a few specifically established and well-delineated exceptions.' " [11] In the context of a motion to suppress, a defendant subjected to such a search must show he had a reasonable expectation of privacy in the relevant location. If so, the search is unlawful unless the government establishes that it fell within one of the exceptions to the warrant requirement.[12]

In *Maryland v. Buie*,[13] the Supreme Court held the Fourth Amendment permits cursory protective sweeps of spaces

---

3. *Id.* 9.

4. *Id.* 26–27.

5. *Id.* 14–15.

6. *Id.* 41, 77.

7. *Id.* 18, 75.

8. *Id.* 24.

9. *Id.* 18–19. Based on defendant's statements to the police, a second firearm also was recovered from the bedroom.

10. *Koch v. Brattleboro,* 287 F.3d 162, 166 (2d Cir.2002) (citing *Illinois v. McArthur,* 531

U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001)).

11. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

12. *United States v. Perea,* 986 F.2d 633, 639 (2d Cir.1993) (citations omitted).

13. 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

where a person might be found in conjunction with in-home arrests if "articulable facts" warrant an inference "that the area to be swept harbors an individual posing a danger to those on the arrest scene."[14] In so doing, it focused on the enhanced risk of danger experienced by an officer in a home, as opposed to on the street or along the highway, stating that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."[15] And it built upon *Terry v. Ohio*,[16] which had upheld warrantless, pre-arrest, on-the-street frisks for weapons based on "specific and articulable facts ... that [the officer] is dealing with an armed and dangerous individual,"[17] and *Michigan v. Long*,[18] which had approved, in like circumstances, preventative searches of automobiles for weapons during roadside encounters.

■ *Buie* strongly suggests the proper result here. The concern for safety when an officer is lawfully present in the home to assist with an OP in a domestic dispute, as occurred in this case, is no less than when the officer is there to make an arrest. Each situation is fraught with the potential for ambush and violence. To be sure, Miller was not belligerent when the officers arrived. Moreover, the presence of two armed officers between Newkirk, wherever precisely he was, and Miller at the time Miller went into the rear bedroom suggests that the risk of violence to Newkirk at that moment was limited. Nevertheless, Officer Vidal knew that the defendant allegedly had threatened "to put a bullet through [Newkirk's] head," a statement which implied motive, a willingness to resort to violence, and access to firearms. He knew also that Newkirk had taken the threat with sufficient seriousness to obtain an OP. These "articulable facts" gave rise to the entirely rational inference that allowing Miller unsupervised access to the rear bedroom might prove dangerous to the safety of the officers and Newkirk.

Miller's contention that Vidal's previous visit to the room with Newkirk deprived him of any justification for returning[19] is unpersuasive. The first entrance lasted only briefly,[20] included no search, and did not "preclude the possibility that there was some residual danger."[21] In these circumstances, the minimal intrusion of following Miller into the rear bedroom[22] was justified as a limited protective sweep[23] even

---

14. *Id.* at 334, 110 S.Ct. 1093.

15. *Id.* at 333, 110 S.Ct. 1093.

16. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

17. *Id.* at 21, 27, 88 S.Ct. 1868.

18. 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

19. Def. Mem. 20. Defendant argues also that protective sweeps are limited to places where there is an individual that might pose a danger to the police and that Officer Vidal knew from his first entrance into the room that no one else was in there. *Id.* 15. *Buie* and *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999), however, show that Vidal's objectively reasonable concern regarding the defendant's presence in the room justified his presence.

20. Tr. 16.

21. *United States v. Lauter*, 57 F.3d 212, 217 (2d Cir.1995) (declining to suppress evidence of a shotgun and holding protective sweep not to be overbroad, even when another agent had already been in the room in question).

22. Officer Vidal stood on the left side of the room without touching either of the closet doors. Tr. 19–20.

23. It is immaterial that Officer Vidal testified that he did not perform a "protective sweep" and that it was not procedure to do so when serving an OP. *Id.* 12. Vidal is a police offi-

assuming that Miller had a reasonable expectation of privacy in that portion of the apartment, an issue that it is unnecessary to reach.

*Conclusion*

The motion to suppress is denied in all respects.

SO ORDERED.

cer, not a constitutional scholar. However characterized, his testimony that he followed Miller into the rear bedroom "for safety," which the Court credits, demonstrates that his actions constituted a protective sweep for constitutional purposes. The Court notes that the Second Circuit has used the terms interchangeably. *See Kiyuyung,* 171 F.3d at 83.