# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3415

_____

United States of America,                  *
                                            *
              Appellee,                     *
                                            *    Appeal from the United States
       v.                                   *    District Court for the District
                                            *    of South Dakota.
David D. Waldner,                           *
                                            *
              Appellant.                    *

_____

Submitted: March 15, 2005
Filed: October 10, 2005

_____

Before MURPHY, BYE, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

David Waldner was sentenced to serve three concurrent six-month terms, a two-year term of supervised release, and pay a special assessment of $100 for unlawful possession of a firearm by a prohibited person and for possession of an unregistered silencer. Pursuant to a conditional plea agreement, Waldner appeals the denial of his motion to suppress evidence of firearms and statements made to the police about those firearms. We reverse.

I. *Background*

David Waldner's wife, Karen Waldner, obtained an ex parte temporary protection order against him. Deputy Sheriff Matt McQuisten and Officer Matt Starr went to Waldner's house to serve the order. McQuisten believed Karen Waldner was home when she called the Sheriff's office to request that the protective order be served. In the petition and affidavit for protection order, Karen Waldner stated that "[t]his morning [Waldner] choked me with his hands around my neck and said that he would kill me. He also threatened to kill me with his guns . . . He has guns, and lately he has been in a very abusive and [agitated] mood-Things will make him mad for no reason."

The officers approached Waldner's home and knocked on the front door. They could see some lights on, including the light of a television. No one answered the door, so the officers looked in the garage windows and saw a pickup parked within. The officers then had the police dispatcher call the house. The officers heard the telephone ring and the answering machine pick up, but no one answered the telephone.

The officers walked to the back of the house where they could still see lights on inside. They also saw that a door leading into the attached garage was open. The officers entered the garage through the door and mounted a few steps to a small platform beside a door leading directly into the house. They knocked on this door, but no one answered. As the officers started to walk away, they heard a dog bark and then Waldner came to the door. The officers introduced themselves and explained why they were there, advising Waldner that he had to vacate the premises immediately.

The officers told Waldner that he could go back into the house and gather a few things, but only if they accompanied him. Waldner consented to allow the officers inside. At no time was Waldner placed in custody. McQuisten explained that before Waldner would be permitted to go into a room, one or both of the officers would first

have to look around that room for weapons or other people. Starr asked Waldner if there was anyone else in the home or if there were any weapons, and Waldner said "no."

Waldner and the officers went into the basement. Starr went down the stairs first. Waldner indicated that he wanted to go into a room to the right side of the stairs to gather clothes. McQuisten looked for weapons or people, and, seeing neither, permitted Waldner into the room. Starr did not enter this room. Instead, he remained in the common area of the basement standing five to ten feet from McQuisten.

When Waldner had finished gathering clothes, he went into the open area of the basement. The officers' and Waldner's testimony diverge at this point. McQuisten testified that he believed Waldner "indicated" an intent to enter the office when he walked toward "that area." McQuisten also testified that he and Waldner were about five to ten feet away from the office. McQuisten indicated that Starr decided to "sweep" the office because it was in the "vicinity." Conversely, Waldner indicated that Starr walked into the basement office, which was fifteen to twenty feet away from where he was standing and talking to McQuisten. Waldner insisted that he gave no indication that he wanted to go into the office.

When Starr entered the office, he immediately saw a wooden gun cabinet with a glass front. Inside the cabinet Starr saw a rifle with an attached silencer, and he alerted McQuisten. Starr suspected that the silencer was illegal. Starr first confirmed with McQuisten that Waldner had stated there were no firearms in the house. Then, Starr asked Waldner if he owned the gun and where he got it. Waldner stated that he found it on a job site, brought it home, and put it in the cabinet. Starr seized the rifle. Waldner then told the officers that he owned other firearms but that these guns were not on the premises. Waldner was indicted on two counts of unlawful possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2),

and one count of possessing an unregistered firearm silencer in violation of 26 U.S.C. §§ 5861(d) and 5871.

Waldner pled not guilty, and he later filed a motion to suppress the firearms and the statements made to the police about those firearms. At a suppression hearing, the magistrate recommended denial of Waldner's motion. Waldner filed objections, and the district court entered an order adopting the magistrate's report and recommendation denying Waldner's motion.

Waldner entered a conditional plea of guilty, reserving his right to appeal the denial of his motion to suppress. The district court accepted Waldner's plea and sentenced Waldner to six months' imprisonment on each count to be served concurrently, a concurrent two-year term of supervised release on each count, and a special assessment of $100 per count.

II. *Discussion*

Waldner argues that Starr went on a "frolic of his own" and entered the office area of the basement, observing the rifle and silencer. Consequently, Waldner contends that a protective sweep under *Maryland v. Buie*, 494 U.S. 325, 327 (1990), was unjustified. We review the district court's conclusion that a protective sweep was justified de novo. *United States v. Cash*, 378 F.3d 745, 747 (8th Cir. 2004) (citing *United States v. Boyd*, 180 F.3d 967, 975 (8th Cir. 1999)). We hold that the entry into the office was unjustified.

In *Buie* the Supreme Court established a two-prong test for determining whether a protective sweep incident to an arrest was constitutionally permissible. First, the *Buie* Court held "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334. Second, the Court permitted

a broader sweep "when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. In either circumstance, a protective sweep "is not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger. . . ." *Id.* at 335–36.

*Buie* authorizes protective sweeps for unknown individuals in a house who may pose a threat to officers as they effectuate an arrest; *Buie* does not allow a protective sweep for weapons or contraband. *See United States v. Noushfar*, 78 F.3d 1442, 1448 (9th Cir. 1996); *United States v. Blue*, 78 F.3d 56, 60–61 (2d Cir. 1996); *United States v. Ford*, 56 F.3d 265, 270 (D.C. Cir. 1995); *United States v. Mains*, 33 F.3d 1222, 1227 (10th Cir. 1994).

The officers conducted the search incident to service of a protective order—a non-arrest situation. Other circuits have applied *Buie* to non-arrest situations but only under the second prong of *Buie*, which requires a showing of a reasonable suspicion of dangerous individuals in the house. *See United States v. Gould*, 364 F.3d 578, 584 (5th Cir. 2004) (en banc); *United States v. Taylor*, 248 F.3d 506, 513–14 (6th Cir. 2001); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993); *United States v. Patrick*, 959 F.2d 991, 996–97 (D.C. Cir. 1992); *United States v. Daoust*, 916 F.2d 757, 758–59 (1st Cir. 1990). We decline the government's invitation to extend *Buie* further.

Although McQuisten and Starr had knowledge, based upon Karen Waldner's affidavit, that Waldner might possess weapons, there is no evidence that the officers had any articulable facts that an unknown individual might be in the office, or anywhere else in the house, ready to launch an attack. Starr entered the room based upon his belief that Waldner might go there to get a firearm. Waldner was five to ten feet from the room when Starr entered the office. Furthermore, Starr stood between

Waldner and the office, which would have required Waldner to pass Starr in order to access the office. Under these circumstances, we hold that the protective sweep exceeded its permissible scope under the Fourth Amendment.

### III. *Conclusion*

For the foregoing reasons, we reverse the decision of the district court denying Waldner's motion to suppress. Because we have held that Starr was not lawfully present in the office, we need not address Waldner's argument that the plain view doctrine should not apply because it was not immediately apparent that the silencer was illegal. Similarly, we do not address Waldner's unpreserved argument that the initial entry into his garage violated the Fourth Amendment because we have held that Waldner's Fourth Amendment rights were violated when Starr entered the office.

MURPHY, Circuit Judge, concurring in the judgment.

The court appropriately decides this case on the factual record made in the district court, which did not establish that the safety of the two officers was threatened given their locations in the basement and the ambiguity in their testimony about whether Waldner was headed into the basement office. This does not mean that Buie would always foreclose a protective sweep when officers are serving a protective order, however. There is a good deal of evidence that serving domestic protection orders can be as dangerous for law enforcement officers as making arrests.

As the court pointed out in United States v. Miller, 306 F.Supp.2d 414, 417 (S.D.N.Y. 2004), such situations are "fraught with the potential for ambush and violence." Here, Deputy McQuisten had reviewed Karen Waldner's petition which averred that Waldner had choked her and "threatened to kill [her] with his guns," and the officers had reason to suspect when they went to the house that they could experience a dangerous encounter. Nevertheless, Waldner was apparently under their control when Officer Starr decided to enter the basement office, where he discovered

-6-

the weapon, and Starr himself testified at the suppression hearing that he could not recall whether or not Waldner had shown an intent to go there. In the proper circumstances, law enforcement officers should be able to do a protective sweep of their immediate surroundings incident to processing the service of a protective order in order to ensure their own safety or that of anyone else present.

_____