**UNITED STATES of America,**
**Appellee,**

v.

**Alfred G. MILLER, Defendant–**
**Appellant.**

**No. 04–2637–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 16, 2005.

Decided: Nov. 16, 2005.

---

David Wikstrom, Law Office of David Wikstrom, New York, NY, for Defendant–Appellant.

Sarah Y. Lai, Assistant United States Attorney (Peter G. Neiman, Assistant United States Attorney, of counsel; David N. Kelley, United States Attorney for the Southern District of New York, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

Before: McLAUGHLIN and CABRANES, Circuit Judges, and MUKASEY, District Judge.*

JOSÉ A. CABRANES, Circuit Judge.

We consider here whether a law enforcement officer who is lawfully present in a particular area of a home for a purpose other than the execution of an arrest

---

* The Honorable Michael B. Mukasey, Chief Judge, United States District Court for the Southern District of New York, sitting by designation.

warrant may conduct a protective sweep pursuant to *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), if he has reasonable suspicion that an individual present in another area of the home poses a threat to those on the premises. We conclude that an officer in a home under lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep when the officer possesses "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the ... scene." *Id.* at 334, 110 S.Ct. 1093.

Defendant Alfred G. Miller appeals from his conviction following a bench trial in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge* ) for possessing a firearm after having been convicted previously of a felony, in violation of 18 U.S.C. § 922(g)(1).[1] In advance of trial, Miller moved to suppress the admission of two firearms and Miller's post-arrest custodial statement admitting possession of the firearms on the ground that they were procured in violation of the Fourth Amendment. At an evidentiary hearing held by the District Court, the evidence showed that a police officer, who was lawfully present in Miller's apartment to carry out a protective order issued to Miller's roommate, had followed Miller into his bedroom "[f]or safety," Tr. of Suppression Hr'g, Jan. 30, 2004 ("Tr."), at 24, and there encountered a firearm in plain view. The officer then arrested Miller, who turned over another

firearm and admitted possession of both firearms while in custody.

In the District Court, the parties disputed whether the seizure of the initially-recovered firearm violated the Fourth Amendment. Miller moved to suppress the evidentiary use of that firearm, arguing that the officer's entry into Miller's bedroom was unlawful, and he moved also to suppress the second firearm and his post-arrest custodial statement, contending that they were the fruits of an unlawful search. The District Court, in a careful and thoughtful opinion, denied the motion on the ground that the initially-recovered firearm had been discovered during a permissible protective sweep of Miller's bedroom pursuant to *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). *See United States v. Miller,* 306 F.Supp.2d 414, 416–18 (S.D.N.Y.2004). We agree with the District Court's conclusion and hold that an officer lawfully present in a particular area of a home may conduct a limited protective sweep of another area of the home provided the officer has reasonable suspicion that the other area harbors a threat to the safety of those on the scene.

Although we are not persuaded by Miller's arguments challenging his conviction, we nevertheless remand the cause pursuant to *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005), so that the District Court may consider whether to resentence Miller.

## BACKGROUND

Two witnesses testified at the hearing on Miller's motion to suppress evidence: Officer Henry Vidal of the New York City Police Department ("N.Y.P.D."), for the government, and Ernesa Mozon, Miller's girlfriend, for Miller. The District Court specifically credited Vidal's testimony, did

---

1. 18 U.S.C. 922(g)(1) makes it unlawful for a person "who has been convicted in any court of[ ] a crime punishable by imprisonment for a term exceeding one year ... to possess in or affecting commerce[ ] any firearm or ammunition."

not credit the contrary testimony of Mozon, and found the events to have occurred as Vidal testified.[2]. The following account traces the findings of the District Court.

Miller's cousin and roommate, Kendu Newkirk, obtained an order of protection against Miller in the Bronx County Family Court on September 23, 2003. The order provided, *inter alia*, that Newkirk could enter the apartment he had been sharing with Miller (the "apartment") "on one occasion with police assistance to remove personal belongings not in issue in litigation: to wit[,] any undisputed personal belongings." *Newkirk v. Miller*, No. O–19936–03, Temp. Order of Prot., at 1 (N.Y. Fam. Ct. Bronx County Sept. 23, 2003).

On the day that the order of protection was signed, N.Y.P.D. Officers Henry Vidal and David Sanchez accompanied Newkirk to the apartment pursuant to the terms of the order. Before the trio went to the apartment, Newkirk informed the officers that he had obtained the order of protection because Miller had threatened to "kick [Newkirk's] ass and put a bullet through his head." Tr. at 9.

Vidal, Sanchez, and Newkirk arrived at the apartment together, and Newkirk opened the door with his keys. The apartment had a foyer, a living room, two bedrooms to the left of a hallway, and a room at the end of the hallway. Encountering Miller and Mozon upon entry, the officers explained that they had come to serve an order of protection and assist Newkirk in obtaining his belongings. Regarding Newkirk, Miller told the officers, "You better watch him, I don't want [him] to take my stuff." *Id.* at 13. Newkirk began to move about the apartment to collect his belongings. Vidal followed Newkirk into

the second bedroom on the left side of the hallway (the "second bedroom"), but then immediately left when Newkirk did. Newkirk then proceeded to remove property from the other rooms in the apartment, and the officers waited for Newkirk in the apartment's hallway. At one point, while in the process of moving items out, Newkirk stepped outside the apartment and the officers stayed inside. Miller, who had remained in the living room, approached the officers, who were standing in the apartment's hallway near the entrance to the second bedroom, and asked whether he could enter the second bedroom to retrieve something. After receiving permission from Vidal, Miller entered the second bedroom and Vidal followed Miller in "[f]or safety." *Id.* at 24.

Once inside the second bedroom, Miller gathered certain belongings, and began to leave the room. Vidal followed Miller towards the door of the room to exit, but on his way out, Vidal saw a shotgun with a black barrel and a yellow band standing upright in an open closet. Miller was arrested, and he then turned over another firearm and admitted possession of both firearms to the officers.

On November 21, 2003, a one-count indictment was filed charging Miller with possessing a firearm after having been convicted previously of a felony, in violation of 18 U.S.C. § 922(g)(1). Miller thereafter brought a motion to suppress the admission into evidence of the firearms and his post-arrest custodial statement on the ground that they were obtained in violation of his Fourth Amendment rights. After an evidentiary hearing held on January 30, 2004, the District Court filed a Memorandum Opinion denying Miller's

**2.** On appeal, Miller does not assert any challenge to the facts as found by the District Court.

motion and concluding that Officer Vidal had discovered the initially-recovered firearm in plain view while engaging in a protective sweep pursuant to *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). *See Miller*, 306 F.Supp.2d at 416–18. The District Court determined that Vidal possessed " 'articulable facts' [that] gave rise to the entirely rational inference that allowing Miller unsupervised access to the [second] bedroom might prove dangerous to the safety of the officers and Newkirk." *Id.* at 417. The Court also determined that Vidal had conducted an appropriately limited protective sweep under the circumstances. *Id.*

Following the denial of his motion to suppress evidence, Miller consented to a bench trial on stipulated facts and preserved his appellate rights with respect to the District Court's denial of his suppression motion. Miller was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and on April 30, 2004, he was sentenced principally to a twenty-nine month term of imprisonment.

On appeal, Miller challenges the District Court's conclusion that the initially-recovered firearm was discovered during a constitutionally permissible *Buie* protective sweep.

## DISCUSSION

### A. *Buie* Protective Sweeps

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search of a home is presumptively unreasonable. *See Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). That presumption is rebuttable, however, *see Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), as "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " *United States v. Knights*, 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

In *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court applied the Fourth Amendment reasonableness test and permitted a limited warrantless search, or protective sweep, in a home by officers who were executing an arrest warrant inside the home and who had a reasonable suspicion that an individual posing a threat to the officers was present elsewhere on the premises. *Id.* at 334, 110 S.Ct. 1093. The Supreme Court explained that the Fourth Amendment did not prohibit the officers from "tak[ing] reasonable steps to ensure their safety after, and while making, the arrest." *Id.* Accordingly, the officers could search beyond the area immediately adjoining the place of arrest if they had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* The Court emphasized, however, that any such warrantless sweep may not be unnecessarily invasive and "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. Moreover, the sweep must "last[ ] no longer than is necessary to dis-

pel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093.

*Buie*'s protective sweep exception to the warrant requirement was constructed on the foundational reasoning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), both of which permitted warrantless searches in specific contexts to ensure the safety of officers. In *Terry,* the Supreme Court sanctioned brief on-the-street frisks for weapons in circumstances when a reasonably prudent officer would be justified in believing, based on specific, articulable facts, that he was dealing with a person who might be armed and dangerous. *See Terry*, 392 U.S. at 21, 24, 27, 88 S.Ct. 1868. *Long* extended *Terry*'s reasoning to the context of a roadside stop, allowing officers to search the passenger area of an automobile for weapons when the officers possess specific and articulable facts that warrant the reasonable belief that a suspect is dangerous and may have immediate access to a weapon. *See Long,* 463 U.S. at 1049–50, 103 S.Ct. 3469. In *Buie,* the Court read *Terry* and *Long* to protect "the immediate interest of [ ] police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them." *Buie,* 494 U.S. at 333, 110 S.Ct. 1093. In addition, the Court recognized that the factors justifying warrantless searches in *Terry* and *Long* were at play, perhaps with even greater force, when officers find themselves "at the disadvantage of being on [their] adversary's 'turf' " during the in-home execution of an arrest warrant, because "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.*

## B. Protective Sweeps in Other Circumstances

■ Twice before, we have confronted the question of whether *Buie* protective sweeps may be conducted when officers are lawfully present in a home for a reason other than the in-home execution of an arrest warrant. *See United States v. Gandia,* 424 F.3d 255 (2d Cir.2005); *United States v. Moran Vargas,* 376 F.3d 112 (2d Cir.2004). In each of those cases, however, we concluded that we did not need to reach the issue because of the absence of specific and articulable facts to support a determination that reasonable suspicion existed. *See Gandia,* 424 F.3d at 257; *Moran Vargas,* 376 F.3d at 115. We now hold that a law enforcement officer present in a home under lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep when the officer possesses "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the … scene." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093.

At the core of *Terry, Long* and *Buie* is the common understanding that the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves. *Buie* recognized that when officers are inside a home—ordinarily an enclosed, unfamiliar space—they are particularly vulnerable to surprise attacks. *Id.* at 333, 110 S.Ct. 1093. The Court's paramount concern in *Buie* was not why the officers were present in the home, but

rather, why the officers might fear for their safety and what they could do to protect themselves. *Buie*'s logic therefore applies with equal force when officers are lawfully present in a home ·for purposes other than the in-home execution of an arrest warrant, at least where their presence may expose the officers to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant. *See ·id.* Indeed, officers executing an arrest warrant may at times enjoy the tactical benefits of counteracting a potential threat by engaging in careful planning and entering with significant force. By contrast, in other circumstances where they are present lawfully—such as, for example, responding to· an ·emergency call or serving an order of protection—officers may be compelled to enter dangerous environments without an adequate opportunity to take effective prophylactic measures.

Several of our sister circuits have refused to confine the protective sweep doctrine to contexts in which officers execute arrest warrants. *See, e.g., United States v. Martins,* 413 F.3d 139, 150 (1st Cir. 2005) ("We hold ... that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry."), *cert. denied,* — U.S. —, 126 S.Ct. 644, — L.Ed.2d — (2005); *Leaf v. Shelnutt,* 400 F.3d 1070, 1086–88 (7th Cir.2005) ("[I]t was not necessary for the officers to have made an arrest in order for their search of the apartment to be justified; the only question is whether the search was objectively reasonable."); *United States v. Gould,* 364 F.3d 578, 584 (5th Cir.2004) (en banc) ("[W]e hold that arrest is not always, or *per se,* an indispensable element of an

in-home protective sweep, and that although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances."), *cert. denied,* 543 U.S. 955, 125 S.Ct. 437, 160 L.Ed.2d 317 (2004); *United States v. Taylor,* 248 F.3d 506,·513 (6th Cir.2001) ("[T]he principle enunciated in *Buie* with regard to officers making an arrest—that the police may conduct a limited protective sweep to ensure the safety of those officers—applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."); *United States v. Garcia,* 997 F.2d 1273, 1282 (9th Cir.1993) (officers permitted to conduct protective sweep following consent entry); *United States v. Patrick,* 959 F.2d 991, 996–97 (D.C.Cir.1992) ("Once the police were lawfully on the premises, they were authorized to conduct a protective sweep based on their reasonable belief that one of its inhabitants was trafficking in narcotics."). *But see United States v. Davis,* 290 F.3d 1239, 1242 n. 4 (10th Cir.2002) (reading *Buie* narrowly to apply only in the context of an arrest); *United States v. Reid,* 226 F.3d 1020, 1027 (9th Cir.2000) (same). We agree with the majority of our sister circuits and adopt a commonsense understanding of the requirements of the Fourth Amendment in circumstances such as those presented here.

■ We are, of course, keenly aware that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). We note, however, that *Buie*'s progenitors, *Terry* and *Long,* did not concern searches stemming from arrests. *See Terry,* 392 U.S. at 24, 88 S.Ct. 1868; *Long,* 463 U.S. at 1049–50, 103 S.Ct. 3469. Moreover,

**100**

*Buie* itself allowed for a protective sweep *after* an arrest had been completed. *See Buie,* 494 U.S. at 334–35, 110 S.Ct. 1093. These factors, along with *Buie*'s grounding in the Fourth Amendment's reasonableness standard, convince us that the fact of an arrest or an attempted arrest (with or without an arrest warrant) is not a necessary precondition to a lawful protective sweep. The restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment. Although, an "arrest may be highly relevant" to the determination of whether officers possess reasonable suspicion of danger, *Gould,* 364 F.3d at 584, the effectuation of an arrest, regardless of whether pursuant to a warrant, is not the *sine qua non* of a permissible protective sweep. *See id.* Accordingly, we hold that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant.[3]

## C. Reasonable Suspicion

We now turn to whether Officer Vidal conducted a lawful protective sweep when he followed Miller into the second

bedroom. We review *de novo* the District Court's legal conclusion that the Fourth Amendment was not violated. *See Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Gandia,* 424 F.3d at 261.

As set forth in *Buie* and as discussed above, a protective sweep may only be conducted when officers possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the ... scene." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. In addition, the sweep must be limited to "a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. Furthermore, the sweep must not last longer than necessary to allay the reasonable suspicion of danger and, in any event, not longer than it takes for the officers to finish the work for which they are lawfully on the premises. *See id.* at 335–36, 110 S.Ct. 1093.

## D. Officer Vidal's Sweep of the Second Bedroom

In entering the second bedroom, Vidal was aware of significant facts that justified his belief that he needed to follow

3. In *Gandia,* we echoed the concern expressed by the Fifth Circuit in *Gould* that the application of *Buie* to consent entries might provide officers an opportunity to circumvent the warrant requirement, as they could request entry with the ulterior purpose of conducting a protective sweep. *See Gandia,* 424 F.3d at 262–63 (citing *Gould,* 364 F.3d at 589). In *Gandia,* that concern was raised because the police officers had asked the defendant—who had been a party to an altercation elsewhere—if they could repair to his apartment to discuss the altercation. *Id.* at 263. We noted that "there was no need for the police officers to enter Gandia's home in

the first place" and that they had simply gone there "for their own convenience" while taking his statement. *Id.* at 263. Here, by contrast, the officers went to Miller's apartment upon the request of his roommate Newkirk pursuant to a judicial order of protection that had been signed by a judge that very day. *See id.* (noting that the risk of pretext may be diminished by the review of an entry "through judicial process" or by "emergent conditions"). Nothing in the record suggests that the officers gained entry into Miller's apartment for any reason other than to assist Newkirk and to carry out the order of protection according to its terms.

Miller "[f]or safety." Tr. at 24. Vidal knew that (1) Miller had made a specific threat to shoot Newkirk in the head; (2) Newkirk had taken the threat seriously and obtained an order of protection; (3) this was a domestic dispute in which the emotions that triggered the threat might resurface; and (4) Miller had expressed suspicion that Newkirk might "take [his] stuff" while moving out of the apartment. In light of these specific facts and the inferences a reasonable officer might draw from them—namely, that Miller might use unsupervised time in the second bedroom to obtain a weapon—it was reasonable for Vidal to conclude that if Miller entered the second bedroom alone, he might pose a threat to those on the scene.[4] *See Martins*, 413 F.3d at 150 (explaining that there was reasonable suspicion to justify a *Buie* sweep in a non-arrest context when "the inference of danger was much more real and immediate than a generic fear"); *cf. United States v. Waldner*, 425 F.3d 514, 517 (8th Cir.2005) (holding that a "protective sweep exceeded its permissible scope under the Fourth Amendment" when an officer "entered [a] room based upon his belief that [an individual being served with a protective order] might go there to get a firearm" even though the individual had not entered the room and was "five to ten feet from the room when [the officer] entered"); *Gandia*, 424 F.3d at 264 (determining that officers lacked specific articulable facts to justify a search, because they looked in "an adjoining room to which [defendant] had no ready access"). When Miller entered the second bedroom, "the danger and imminence of ambush then dramatically increased, justifying the [brief] 'sweep.'" *Gould*, 364 F.3d at 589. Vidal did not engage in a sweep of areas inaccessible to Miller for the purpose of ferreting out secreted firearms, *cf. Waldner*, 425 F.3d at 517; *Gandia*, 424 F.3d at 264, but rather, followed Miller—about whom Vidal had an objectively reasonable fear—to ensure the safety of everyone on the scene.

The protective sweep that Vidal conducted was limited. It amounted to following Miller into the second bedroom and watch-

---

**4.** Here, Vidal knew that Miller was the potential threat. We acknowledge that *Buie* involved the risk of an unknown threat posed by hidden third parties, *see Buie*, 494 U.S. at 333, 336, 110 S.Ct. 1093; *see also Gandia*, 424 F.3d at 261–62, yet we discern nothing in the reasoning of *Buie* that prohibits its application to sweeping for obvious or known threats. In other words, we do not read the Fourth Amendment—whose touchstone is reasonableness—to require that a threat be hidden and unknown before an officer can engage in appropriately limited protective action. Our understanding is consistent with the foundational cases upon which *Buie* was decided, *Terry* and *Long*, as well as another case discussed in *Buie*, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), all of which contemplate limited warrantless searches "in order for police 'to assure themselves that *the persons with whom they [are] dealing* [are] not armed with, or able to gain immediate control of, a weapon.'" *Gandia*, 424 F.3d at 262 (quoting *Buie*, 494 U.S. at 333, 110 S.Ct. 1093) (emphasis added) (alterations in original).

We also note that we are not troubled here by the fact that Vidal granted Miller permission to enter the room. That fact does not suggest that Vidal considered it safe for Miller to enter the room alone; indeed, Vidal's awareness of the potential threat prompted him to accompany Miller. Moreover, nothing in the record suggests that Vidal gave his approval with the purpose of justifying a protective sweep of Miller's bedroom. *See* note 3 *supra*. In fact, Vidal testified that he did not know to whom the room that Miller sought to enter belonged. That testimony, which the District Court credited and defendant does not challenge, is particularly significant in light of the fact that Newkirk had gone into that very room, among others, as he was removing his belongings from the apartment.

ing him briefly. When Miller immediately left the room, Vidal followed him and thereupon caught sight of a firearm in plain view inside an open closet as he walked out of the room. This quick and unobtrusive search was narrowly tailored to dispel the threat that Miller would have posed by being in the second bedroom alone. Consequently, we conclude that Vidal did not violate Miller's Fourth Amendment rights by entering the second bedroom.

On appeal, Miller does not dispute the application of the plain view doctrine to the discovery of the shotgun in the closet. When inside the second bedroom, Vidal saw a shotgun in the open closet and lawfully seized it pursuant to the plain view doctrine. *See Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."). At that point, the officers had a legitimate basis for arresting Miller. Accordingly, the other firearm that Miller turned over and the custodial statements he made thereafter were not the result of unlawful conduct and therefore were not excludable as "fruit of the poisonous tree." *See Segura v. United States,* 468 U.S. 796, 804–05, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### E.  *Crosby* Remand

Miller requests that this action be remanded pursuant to *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005), and the government has consented. We agree and we thus remand the cause to the District Court so that it may determine whether to resentence Miller in accordance with the currently applicable statutory requirements as outlined in *Crosby.*

### CONCLUSION

To summarize, we hold that:

(1) the *Buie* protective sweep doctrine may apply in situations other than the in-home execution of an arrest warrant;

(2) in light of the specific, articulable facts presented here, and the reasonable inferences that could be drawn by the police officer, the officer was justified in conducting a protective sweep of the second bedroom;

(3) the protective sweep was adequately limited in scope to satisfy the requirements of the Fourth Amendment;

(4) the shotgun seized was in plain view of the officer once he had lawfully entered the second bedroom to conduct the protective sweep; and

(5) because the shotgun observed in plain view by the police officer was lawfully seized, the other evidence obtained thereafter was not "fruit of the poisonous tree."

\*  \*  \*  \*  \*  \*

Accordingly, we conclude that the District Court properly denied defendant's suppression motion. The judgment of conviction is **AFFIRMED**, and the cause is **REMANDED** to the District Court for consideration of whether to resentence defendant in accordance with *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005).