**UNITED STATES of America,
Plaintiff,**

v.

**Erick HASSOCK, a/k/a "Carl Small,"
a/k/a "Carl Washington–Small,"
a/k/a "Basil," Defendant.**

**No. 09 Cr. 228(BSJ).**

United States District Court,
S.D. New York.

Nov. 20, 2009.

Jennifer Eileen Burns, U.S. Attorney's office, New York, NY, for Plaintiff.

Stanislao A. German, Law Office Of Stanislao A. German, New York, NY, for Defendant.

## OPINION AND ORDER

BARBARA S. JONES, District Judge.

On March 13, 2009, Defendant Erick Hassock ("Defendant" or "Basil") was charged, in a two-count indictment, with illegal re-entry subsequent to a felony conviction, in violation of 8 U.S.C. §§ 1326(a), 1326(b)(1), and unlawful possession of a firearm subsequent to a felony conviction, in violation of 18 U.S.C. § 922(g)(1).

Defendant has moved to suppress a firearm recovered from his bedroom on November 25, 2008. The parties have briefed this motion, and the Court held an evidentiary hearing on June 26, 2009 (the "Hearing"), after which each party proposed findings of fact and conclusions of law. For the reasons that follow, the Court GRANTS Defendant's motion to suppress.

## FACTS

In early November 2008, Special Agent Christopher Quinn of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), received information from a confidential informant [1] that an individual who went by the name "Basil" was involved in marijuana trafficking, had previously been deported from the United States, and illegally possessed a firearm. (Hearing Transcript ("Tr.") 3:13–4:2.) [2] Quinn and other members of an organized crime drug enforcement task force (the "task force" or "team") [3] commenced an investigation which revealed that "Basil" resided in the front bedroom of a basement apartment at the ground

---

**1.** As of January 22, 2009, the confidential informant had been working with ICE for over one year and the informant's information regarding this investigation and other cases in which the informant had been involved had been corroborated by independent evidence. (Complaint ¶ 2.)

**2.** Unless otherwise noted, the facts in this section are taken from the Hearing testimony

of Special Agent Quinn, which the Court credits.

**3.** The multi-agency task force was composed of the Drug Enforcement Administration, the Federal Bureau of Investigation, the New York Police Department, the New York State Police, and the Internal Revenue Service. (Hearing Transcript ("Tr.") 3:14–17.)

level of 3201 Mickle Avenue (the "Apartment") in the Bronx, and that he was not legally employed, stayed out late, slept late, and generally left his apartment around noon. (Tr. 4:4–16.) The confidential informant also provided Quinn with a picture and physical description of "Basil"—an African American male approximately six feet tall, weighing approximately 220 pounds—as well as a description of the Apartment and its layout. (Tr. 11:10–22; 23:14–17.)

To identify "Basil" the task force conducted record and residence checks, but their efforts were ultimately unsuccessful. (Tr. 4:24–5:1.) "Then, at a certain point" the team "decided to go and speak to the defendant." (Tr. 5:1–2.) On November 25, 2008, Quinn and four other members of the team went to the Apartment to conduct surveillance and perform a "knock and talk," which Quinn described as "knock[ing] on the door and interview[ing] potential residents to see if the information that we have is accurate, to see if there is any further follow-up investigation we can do." (Tr. 14:23–15:6.) Quinn testified that "the initial reason" the task force went to the Apartment was to talk to "Basil" but that "another reason" "would be to potentially arrest him." (Tr. 15:17–24.) At no time prior to November 25, 2008 did the team conduct visual surveillance of the Apartment, speak to any neighbors, or attempt to obtain a search warrant or arrest warrant. (Tr. 13:14–25.)

On November 25, 2008, Quinn and the other members of the task force arrived outside the Apartment around 8:00 AM. (Tr. 4:11.) They remained in their vehicle for approximately one hour, during which nobody was seen entering or leaving the Apartment. (Tr. 5:13–16.) Around 9:00 AM, they decided to approach and knock on the front and rear doors of the Apartment simultaneously; Quinn, Agent Mansfield and Sergeant Spinosa went to the front door and Detective John Salvetti and Agent Krajuzki went to the back. (Tr. 5:17–23.) On cross-examination, Quinn agreed that "the purpose of knocking on the door was to have this conversation with a person whom [he] believed was known as Basil," that "this was a voluntary decision to go knock on the door," and that Quinn was not "under any legal obligation" to do so. (Tr. 18:2–11.)

The team members at the front door knocked for approximately one minute but heard no response. (Tr. 20:12–14.) Quinn then received word by radio from the two team members at the back door that someone was opening that door, and so he walked to the rear of the apartment building. (Tr. 6:8–12.)

When Quinn arrived, the back door was open and team members were already inside speaking with a woman. (Tr. 6:13–15; 20:23–21:7.)[4] Quinn testified that he walked into the Apartment and that he either overheard the woman tell a team member that they had awoken her and that she did not know who was in the Apartment or that a team member repeated this to him. (Tr. 6:13–18; 20:23–25; 51:21–23.) Based on that information, Quinn and Salvetti quickly surveyed its layout[5] and then walked together to the front room, which Quinn believed was "Basil's" bedroom, "to see if anyone else was in that bedroom, potentially hiding." (Tr. 6:25–7:1; 22:3–5.) Quinn was concerned that "Basil" may have been in the front

---

**4.** At the time, Quinn knew nothing about this woman. He later learned that she was the girlfriend of Defendant's roommate, with whom she lived in the back bedroom.

**5.** Quinn described the Apartment as "pretty small," consisting of two bedrooms, a small living room, a small kitchen, and a common or storage area. (Tr. 22:7.)

bedroom "and could come out with a firearm or a gun or pose a danger." (Tr. 24:2–3.) As they approached the bedroom, Quinn had his gun drawn or his hand on his gun "for officer safety." (Tr. 7:8–14.)

The ten-by-ten-foot [6] bedroom was occupied mainly by a queen-sized bed which rested on a frame. The bed was not dressed with a bed skirt or dust ruffle. Quinn estimated that the bed was raised from the floor by five to six inches,[7] which, based on his experience, "looked like an area that someone could hide in." (Tr. 53:1–2.) Quinn further testified that "it's harder to judge the height of the bed until you actually bend over." (Tr. 53:14–16.)

Once they entered the bedroom, Detective Salvetti went around the bed and Quinn looked under it. With his gun drawn, standing three or four feet from the edge of the bed, Quinn "squatted all the way down" and saw a gun—a Hi–Point .380 caliber with a defaced serial number— six to eight inches from the edge of the bed. (Tr. 53:22–23.) Once Quinn notified Detective Salvetti of his discovery,[8] they secured and unloaded the firearm. Before leaving the front bedroom, they looked into a closet. Their search of the front bedroom took less than a minute in all.

During the course of their visit, members of the task force also looked in the Apartment's common area and behind and underneath the sofa, although they did not look under the sofa cushions. The team remained in the Apartment for "a couple of hours," during which they interviewed the woman who had answered the back door. (Tr. 28:25–29:2.)

**DISCUSSION**

Defendant claims that Quinn violated his Fourth Amendment rights by conducting an illegal search of his bedroom. He moves to suppress the gun that was recovered from his bedroom as the fruit of that unlawful search. The Government counters that the gun was found during a lawful protective sweep. Defendant replies that (1) the protective sweep doctrine does not apply in these circumstances; (2) even if the doctrine does apply here, the search was not supported by a reasonable suspicion of danger; and (3) the search exceeded the scope of a protective sweep.

The Court declines to extend the protective sweep doctrine to the facts and circumstances in this case, and GRANTS Defendant's motion on that basis.

### 1. The Protective Sweep Doctrine

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (quotations and citations omitted). That presumption is rebuttable, however, as "warrantless searches of homes, while subject to special scrutiny, are nevertheless also subject to a balancing test—weighing an individual's expectation of privacy against the government's need for certain information—for

---

**6.** Quinn estimated that the bedroom measured ten-by-ten to twelve-by-twelve feet; Defendant states that the bedroom was approximately ten feet by ten feet. (Affidavit in Support of Notice of Motion to Suppress Evidence, ¶ 8.)

**7.** Defendant estimates that the distance was four inches. (Affidavit in Support of Notice of Motion to Suppress Evidence, ¶ 9.)

**8.** Quinn had not been informed that "Basil" kept a firearm under his bed.

determining reasonableness under the Fourth Amendment." *In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 157, 173 (2d Cir.2008).

In *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court applied the Fourth Amendment reasonableness test and permitted a limited warrantless search, or protective sweep, in a home by officers who were executing an arrest warrant inside the home and who had a reasonable suspicion that an individual posing a threat to the officers was present elsewhere on the premises. *Id.* at 334, 110 S.Ct. 1093. The Supreme Court explained that the Fourth Amendment did not prohibit the officers from "taking reasonable steps to ensure their safety after, and while making, the arrest." *Id.* Accordingly, the officers could search beyond the area immediately adjoining the place of arrest if they had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger" to those on the scene. *Id.* The Court emphasized, however, that any such warrantless sweep may not be unnecessarily invasive and "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. Moreover, such a sweep must "last [ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. 1093.

## 2. Application of the Protective Sweep Doctrine to this Case

Defendant concedes that the task force lawfully entered the Apartment with the consent of its female occupant. (Tr. 41:22–6.) But the Government concedes that the team did not have consent to enter Defendant's bedroom. (Tr. 42:7–19.)[9] Therefore, the search of that room was lawful only if it was pursuant to a valid protective sweep.

Assuming for the moment that the protective sweep doctrine applies in these circumstances, the Court finds that (a) the task force possessed specific and articulable facts which "would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger" to those on the scene, *Buie,* 494 U.S. at 334, 110 S.Ct. 1093, and (b) the protective sweep was properly limited in scope.

■ As for (a), Quinn knew from the confidential informant that Defendant was known to traffic in narcotics and that he illegally possessed a gun. In addition, the task force arrived at a time when they expected Defendant to be home: they knew that he did not usually leave the apartment until around noon, and during their surveillance that morning from 8:00 AM to around 9:00 AM the team saw nobody enter or leave the apartment. Further, the inconclusive statement by the girlfriend of Defendant's roommate that she did not know who was in the apartment did not rule out the possibility that Defendant was there. Moreover, the apartment's small size heightened the risk of a surprise confrontation. These articulable facts, together with the rational inferences which could be reasonably drawn from them—namely, that Defendant may have been in the front bedroom of the apartment with a gun—"would warrant a

---

**9.** According to the Government's proffer, the woman allowed Salvetti into the Apartment. (Tr. 51:11.) In addition, Quinn testified that once the team was in the Apartment, in response to a team member's request "Can we look around?" she said yes. (Tr. 6:18–19.)

reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger" to those on the scene. *Id.* at 334, 110 S.Ct. 1093.

■ As for (b), the Court finds that the scope of the sweep was properly limited. As discussed, such a sweep "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. There is unchallenged testimony that Defendant's bed was raised off the floor and that there was no bed skirt or dust ruffle. (Tr. 8:7–11.) Although Defendant estimates that the bed was only four inches above the ground (Affidavit in Support of Notice of Motion to Suppress Evidence, ¶ 9.), the Court credits Quinn's testimony that it is difficult to judge the precise height of a bed while standing. (Tr. 53:14–16.) Moreover, Quinn testified credibly that in his experience, the places where a person may hide can often be quite small. (Tr. 53:1–4.) On these facts, the Court concludes that it was reasonable for the task force to fear that Defendant may have been hiding under the bed. *See e.g., United States v. Bass,* 315 F.3d 561, 564 (6th Cir.2002) (holding that officers were justified "in inspecting those spaces in the apartment where another person could have been hiding," including under the box springs of a bed, because an officer testified that the bed was on a frame sufficiently high enough off the ground for a person to be under it); *United States v. Boyd,* 180 F.3d 967, 975 (8th Cir.1999) (upholding protective sweep where officer "looked around the master bedroom, *under the bed,* and looked into the closet") (emphasis added); *cf. United States v. Paradis,* 351 F.3d 21, 30 (1st Cir.2003) ("[B]y their own testimony the

police established that the only logical place someone could hide in the bedroom was under the bed, where they found [Defendant].").

Because the Court concludes that the search was supported by a reasonable suspicion of danger and it did not exceed the scope of a protective sweep, the Court must decide whether the protective sweep doctrine applies in this context.

### 3. Protective Sweeps Outside of the Arrest Context

The Second Circuit has extended *Buie* beyond the arrest context: "[A]n officer lawfully present in a particular area of a home may conduct a limited protective sweep of another area of the home provided the officer has reasonable suspicion that the other area harbors a threat to the safety of those on the scene." *United States v. Miller,* 430 F.3d 93, 95 (2d Cir. 2005).[10] Under *Miller,* "a law enforcement officer present in a home *under lawful process,* such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep," assuming the requisite reasonable fear of danger. *Id.* at 98 (emphasis added). The *Miller* panel reasoned:

> The Court's paramount concern in *Buie* was not why the officers were present in the home, but rather, why the officers might fear for their safety and what they could do in those circumstances to protect themselves. *Buie's* logic therefore applies with equal force when officers are lawfully present in a home for purposes other than the in-home execution of an arrest warrant, at least where their presence may expose the officers

---

**10.** A minority of circuits disagree and continue to uphold protective sweeps only where they are conducted incident to an arrest. *See United States v. Torres–Castro,* 470 F.3d 992,

996–997 (10th Cir.2006); *United States v. Waldner,* 425 F.3d 514 (8th Cir.2005); *United States v. Reid,* 226 F.3d 1020, 1027 (9th Cir. 2000).

to danger that is similar to, or greater than, that which they would face if they were carrying out an arrest warrant. *See* [*Buie*, 494 U.S. at 333, 110 S.Ct. 1093.] (noting the "disadvantage of being on [an] adversary's 'turf'"). Indeed, officers executing an arrest warrant may at times enjoy the tactical benefits of counteracting a potential threat by engaging in careful planning and entering with significant force. By contrast, in other circumstances where they are present lawfully—such as, for example, responding to an emergency call or serving an order of protection—officers may be compelled to enter dangerous environments without an adequate opportunity to take effective prophylactic measures.

*Id.* at 99.

■ Although *Miller* speaks in general terms of the possibility of a protective sweep "in circumstances other than during the in-home execution of an arrest warrant," *id.* at 100, the Second Circuit has yet to determine the propriety of protective sweeps where officers gain access to a suspect's home through consent. In fact, the *Miller* panel cautioned that "the application of *Buie* to consent entries might provide officers an opportunity to circumvent the warrant requirement, as they could request entry with the ulterior purpose of conducting a protective sweep." *Id.* at 100 n. 3; *see also United States v. Gandia*, 424 F.3d 255, 262 (2d Cir.2005) (expressing "concern that generously construing *Buie* will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home").

The Government attempts to allay this concern by arguing that there is no indication that the task force had a pretextual purpose. To be sure, the team did not "create[ ] a situation in which the defen-

dant would not be home so that they could find a way to enter his home without a warrant"; instead, they went to his home at a time when they expected him to be there. (Government's Post–Hearing Reply Brief in Further Response to Defendant's Motion to Suppress at 4.) And the Court has no reason to conclude that the task force requested entry with the ulterior purpose of conducting a protective sweep. Nevertheless, extending the protective sweep doctrine to the facts of this case strongly implicates the pretext concerns expressed in *Miller* and *Gandia*. And while the *Miller* court noted that the risk of pretext "may be diminished by the review of an entry 'through judicial process' or by 'emergent conditions,'" *Miller*, 430 F.3d at 100 n. 3 (citing *Gandia*, 424 F.3d at 263), neither existed here.

The Government also emphasizes the task force's safety-concerns, arguing that "the *Miller* court made clear that the permissibility of a protective search turns not on which lawful reason the officers had for being in the home, but on 'why the officers might fear for their safety and what they could do to protect themselves.'" (Government's Post–Hearing Proposed Findings of Fact and Conclusions of Law in Further Response to Defendant's Motion to Suppress at 10 (quoting *Miller*, 430 F.3d at 99)). However, this argument ignores the critical fact that the task force chose to expose its members to the danger against which the sweep at issue aimed to protect. The Second Circuit in *Gandia* expressed concern about consent entries followed by protective sweeps precisely because "there was no need for the police officers to enter Gandia's home in the first place. They were there for their own convenience." *Gandia*, 424 F.3d at 263. By contrast, the officers in *Miller* went to the apartment in question pursuant to a judicial order of protection. Here, unlike

when officers enter a suspect's home in order to execute an arrest warrant, pursuant to a judicial order of protection, or under exigent circumstances, the task force decided when to approach and enter Defendant's home. *See id.* Just as in *Gandia*, the task force "could have avoided 'the disadvantage of being on [their] adversary's turf.'" *Id.* (quoting *Buie*, 494 U.S. at 333, 110 S.Ct. 1093.).

Quinn testified that the task force went to the Apartment to speak to Defendant and/or other residents. Yet the team could have done so by waiting outside until someone exited or entered. Even after they decided to approach and knock on the Apartment's doors—after only an hour of surveillance—once its female occupant answered, the task force could have asked her to step outside or accompany them elsewhere for an interview. Surely the task force was not "compelled to enter [a] dangerous environment[ ] without an adequate opportunity to take effective prophylactic measures." *Miller*, 430 F.3d at 99.

The Court is mindful that *"Buie's* protective sweep exception to the warrant requirement was constructed on the foundational reasoning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), both of which permitted warrantless searches in specific contexts to ensure the safety of officers." *Miller*, 430 F.3d at 98. *Terry* established a limited exception to the probable cause and warrant requirements, the narrow scope of which the Supreme Court "has been careful to maintain." *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (citation omitted). Therefore, "the police must, whenever practicable, obtain advance judicial approv-

al of searches and seizures through the warrant procedure." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. Here, the task force received information from the confidential informant about "Basil" several weeks before November 25, 2008 but did not attempt to obtain an arrest warrant or search warrant.[11]

At bottom, "[t]he test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The degree to which this search intruded upon Defendant's privacy was high—indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("[W]ith few exceptions, the question of whether a warrantless search of a home is reasonable and hence constitutional must be answered no."). By contrast, the record here belies any need for the search at issue because the task force was not required to enter the Apartment at all; they chose to do so.

In all, a protective sweep may be reasonable, and therefore constitutional, where officers enter a suspect's home in order to execute a warrant, to enforce an order of protection, or pursuant to exigent circumstances. And there may be circumstances where police enter by consent and truly emergent conditions then arise. Here, however, by making a voluntary decision to enter the Apartment at approximately 9:00 AM on November 25, 2008, the task force put themselves at risk of the

**11.** In explanation, Quinn testified that he was unsure whether he had information that "reached the level of probable cause" as of November 25, 2008, because "[a]t that point the defendant was not fully [identified]." (Tr. 13:25–14:8.)

very danger that necessitated the protective sweep. And nothing the officers learned upon entering—i.e., that the Defendant might be there—was new to them. Accordingly, the Court finds that the search of Defendant's bedroom was unreasonable under the Fourth Amendment and the Court GRANTS Defendant's motion to suppress the gun that was recovered as a result of that search.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to suppress the firearm that was recovered from his bedroom.

SO ORDERED.