

Sep 16 2015, 9:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Timmie Bradley,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

September 16, 2015

Court of Appeals Case No.
49A05-1404-CR-181

Appeal from the Marion Superior
Court

The Honorable Daniel L. Pflum,
Senior Judge

Trial Court Cause No.
49G20-1301-FA-3632

**Bradford, Judge.**

# Case Summary

[1] In December of 2012, the Indianapolis Metropolitan Police Department

("IMPD") received an anonymous complaint alleging that drug dealing was

occurring at a home in Indianapolis. Detectives with the IMPD placed the home in question under surveillance. After conducting surveillance on a number of occasions, the detectives approached the home, identified themselves, and requested permission to enter the home. After being granted consensual entry into the home, the detectives became concerned for their safety and conducted a protective sweep of the kitchen and an adjacent bedroom. During this protective sweep, the detectives observed a very small amount of cocaine and drug paraphernalia in plain sight in the kitchen. The occupants of the home were brought into the living room of the home. Because the occupants' arms were not restrained, the detectives looked under couch cushions before allowing the occupants to sit on the couch. A handgun was discovered under the cushions.

[2] A short time later, Appellant-Defendant Timmie Bradley used a key to let himself into the home. Bradley, who had his hand in his left pocket, did not comply with the detectives' orders to remove his hand from his pocket. Bradley was subsequently searched because of the detectives' concern for their safety after observing drug paraphernalia and a handgun in the home. The detectives found approximately thirty grams of cocaine and a large amount of United States currency on Bradley's person.

[3] Appellee-Plaintiff the State of Indiana subsequently charged Bradley with numerous offenses, including Class A felony dealing in cocaine, Class C felony possession of cocaine and a firearm, Class C felony possession of cocaine, and Class A misdemeanor possession of marijuana. Following a bench trial, the

trial court found Bradley guilty of each of the above-stated offenses. The trial court sentenced Bradley to an aggregate thirty-five-year term of incarceration.

[4] On appeal, Bradley contends that the trial court abused its discretion in admitting certain evidence at trial; his convictions for Class C felony possession of cocaine and a firearm and Class C felony possession of cocaine violate the prohibitions against double jeopardy; and the evidence is insufficient to sustain his convictions for Class A felony possession of cocaine, Class C felony possession of cocaine and a firearm, and Class A misdemeanor possession of marijuana. Upon review, we conclude that (1) the trial court did not abuse its discretion in admitting the challenged evidence at trial, (2) Bradley's convictions for Class C felony possession of cocaine and a handgun and Class C felony possession of cocaine violated the prohibitions against double jeopardy and therefore must be vacated, (3) the evidence is sufficient to sustain Bradley's conviction for Class A felony possession of cocaine, and (4) the evidence is insufficient to sustain Bradley's conviction for Class A misdemeanor possession of marijuana. We therefore affirm in part, reverse in part, and remand to the trial court with instructions.

## Facts and Procedural History

[5] In December of 2012, Indianapolis Metropolitan Police Detective Scott Campbell received an anonymous complaint alleging that drug dealing was occurring at a home located at 2207 North Alabama Street. Between receiving the anonymous complaint and January 14, 2013, Detective Campbell and

Detective Simmea McCoy conducted surveillance at the home on three or four occasions. On one such occasion, Detectives Campbell and McCoy observed, within a short period of time, heavy foot traffic in and out of the home with the visitors "going inside, staying for [a] very short amount of time and leaving." Tr. p. 37. In their experience as law enforcement officers, Detectives Campbell and McCoy knew that such activity was indicative of the sale of drugs.

[6] On another occasion, Detectives Campbell and McCoy observed Bradley drive a blue pickup truck to the home, approach the home, and enter it. That same day, Detectives Campbell and McCoy observed another individual, who was subsequently identified as Bryant Beatty, drive a blue minivan to the home, approach the home, and enter it. A search for the identity of the lessor of the home was unsuccessful.

[7] On the afternoon of January 15, 2013, Detectives Campbell and McCoy, along with Detective Tracy Lomax (collectively, "the Detectives"), conducted surveillance at the home. At approximately 3:00 p.m., the Detectives observed Beatty pull up at the home in a blue minivan. This was the second time Detectives Campbell and McCoy had observed Beatty arrive at the home driving the blue minivan during the course of their investigation. The Detectives further observed Beatty approach the home. Beatty knocked on the front door and, soon thereafter, someone inside the home opened the door to allow him to enter.

[8] After watching Beatty enter the home, the Detectives, all of whom were wearing plain clothes but were wearing lanyards with their police badges displayed and possibly police vests, decided to conduct a "knock and talk." Tr. p. 103. When the Detectives approached the home, Detective Campbell immediately detected the odor of burnt marijuana coming from the home. With Detective Lomax standing at the far end of the porch and Detective Campbell standing nearby, Detective McCoy knocked on the front door. When Beatty opened the front door a short time later, Detectives McCoy and Lomax also detected the odor of burnt marijuana coming from the home.

[9] After Beatty opened the front door, Detective McCoy identified himself and Detectives Campbell and Lomax and explained that they had come to the home because of a narcotics complaint. Detective McCoy requested permission for himself and Detectives Campbell and Lomax to step inside the home and speak with Beatty. Beatty responded yes and stepped to the side to allow the Detectives to enter the home.

[10] Upon entering the home, the Detectives were standing in a living room. They observed a closed bedroom door with music coming from inside the bedroom. Detective McCoy asked Beatty if there was anyone else in the home. Beatty responded that there was not.

[11] Within seconds of Beatty indicating that there was no one else in the home, the Detectives observed a black male "peak [sic]" his head around the kitchen corner. Tr. p. 152. The black male retreated after seeing the Detectives.

Because the Detectives could not see into the kitchen, Detective McCoy ordered the individual in the kitchen to come into the living room. The individual did not comply with Detective McCoy's order.

[12] After the individual in the kitchen failed to comply with Detective McCoy's order, Detectives McCoy and Lomax, out of concern for their and Detective Campbell's safety, conducted a protective sweep of the kitchen. While in the kitchen, Detectives McCoy and Lomax observed several items sitting on a counter in plain view: a set of digital scales, a "very small amount of cocaine," a glass jar with white residue on the bottom, and baking soda which can be used as a cutting agent. Tr. p. 181. Also while in the kitchen, Detectives McCoy and Lomax encountered a man, who was subsequently identified as Cortez Bradley. Detectives McCoy and Lomax brought Cortez into the living room along with a third black male who had been in the adjacent bedroom.

[13] The Detectives detained Beatty, Cortez, and the other individual in the living room and advised them of their *Miranda*[1] rights. The Detectives decided to sit the three men down on a couch in the living room while they completed their investigation. Although the three men were not free to leave, their hands were not restrained at this time. Prior to sitting the men down on the couch, out of concern for officer safety, Detective Campbell conducted a quick search of the couch for weapons by lifting the cushions. During this quick search, Detective

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Campbell found a small handgun under one of the cushions. The Detectives then loosely handcuffed the three men together and sat them on the floor. All three men denied both living at the home and knowing who did.

[14] A short time later, Bradley pulled up to the home, driving a blue pickup truck. Bradley approached the home and opened the front door with a key. The Detectives immediately identified themselves when Bradley entered the home.

[15] Upon entering the home, Bradley's left hand was in his coat pocket. The Detectives ordered Bradley to remove his hand from his pocket. Bradley did not comply with this order but rather moved his hand around in his pocket. When Bradley failed to comply with their order, Detectives Campbell and McCoy "took him down to the ground." Tr. p. 63. The Detectives then observed a baggie containing a large quantity of cocaine sticking out of Bradley's coat pocket. Detective Lomax then conducted a search of Bradley's person, during which he recovered the baggie containing the large amount of cocaine, "a large amount of US currency," and a small amount of cocaine from Bradley's pant coin pocket. Tr. p. 94. The baggie containing the large amount of cocaine was later determined to contain approximately thirty grams of cocaine, which has a street value of approximately $1100 to $1200. Detective McCoy indicated that in his experience as a law enforcement officer, such a large quantity of cocaine was indicative of dealing rather than personal use, especially when combined with the digital scales, baking soda, and glass jar recovered from the kitchen; the handgun; and the large quantity of United States currency recovered from Bradley's person.

[16] Bradley was arrested and advised of his *Miranda* rights. Although Bradley initially denied living at the home or knowing who did, he later admitted that he lived in the home. The Detectives subsequently discovered marijuana on Beatty's person after he made furtive movements. A search of the rest of the home revealed heroin in a sock on a bedroom closet shelf, marijuana and a digital scale in a kitchen cabinet, and another digital scale in a drawer next to the stove in the kitchen.

[17] On January 18, 2013, the State charged Bradley with Count I – Class A felony dealing in cocaine, Count II – Class C felony possession of cocaine and a firearm, Count III – Class C felony possession of cocaine, Count IV – Class A felony dealing in heroin, Count V – Class C felony possession of heroin and a firearm, Count VI – Class C felony possession of heroin, and Count VII – Class A misdemeanor possession of marijuana.

[18] Bradly subsequently filed a motion to suppress all evidence seized as a result of the officers' warrantless search of his home. He also subsequently waived his right to a trial by jury.

[19] The trial court conducted a two-day combined suppression hearing and bench trial on February 3, and February 26, 2014. At the conclusion of the combined suppression hearing and trial, the trial court took the question of whether the Detectives had lawfully entered the home under advisement. However, the trial court gave preliminary rulings relating to the specific pieces of evidence that were covered by Bradley's motion to suppress.

[20]     In ruling on Bradley's motion to suppress, the trial court found that, assuming that the Detectives had legally entered the home, "what was found in the drawer is out, the heroin is out. That's out because it was not in plain view and [the Detectives] didn't have right to even look there." Tr. p. 259. The trial court then entered not guilty verdicts on Counts IV, V, and VI. The trial court further found that, again, assuming that the Detectives had legally entered the home, the evidence that was in the Detectives' plain view when they did their protective sweep of the home and the evidence that was recovered from Bradley's person was admissible at trial. With respect to the handgun, the trial court found as follows:

> But based on the testimony that I heard was that yes, these individuals were not free to leave. Whether they were handcuffed or not at the time that they tossed the couch, there's some confusion there, again, which I can understand in that situation. But, but the testimony was clear that the purpose was whether they were handcuffed or not. They were going to sit the individuals down on the couch to make them comfortable -- which I would prefer to sit on a couch as opposed to a floor myself if I was going to have to sit for a long time knowing how long they were going to be here and be in my house. And so taking the sofa off -- the cushions off just to look, to make sure there was nothing underneath of there, a weapon of some sort was perfectly legit. So if, again, if the entry into the house was legal, then finding the gun was appropriate. So that, that part of it is there.

Tr. pp. 272-73. In sum, the trial court found that "basically what they found once they were in the house is in, except for the heroin, and what was in that one drawer." Tr. p. 273.

On or about March 10, 2014, the trial court denied Bradley's motion for suppression of the remaining evidence at issue and entered guilty findings on Counts I, II, III, and VII. On March 25, 2014, the trial court imposed the following sentence: thirty-five years for Count I – Class A felony possession of cocaine, eight years for Count II – Class C felony possession of cocaine and a firearm, eight years for Count III – Class C felony possession of cocaine, and one year for Count VII – Class A misdemeanor possession of marijuana. The trial court ordered that the sentences imposed for Counts II, III, and VII run concurrently to the sentence imposed for Count I, for an aggregate thirty-five-year sentence. This appeal follows.

## Discussion and Decision

Bradley contends that the trial court abused its discretion in admitting certain evidence at trial. He also contends that his convictions violate the prohibitions against double jeopardy and that the evidence is insufficient to sustain his convictions. We will discuss each contention in turn.

## I. Admission of Evidence

Bradley contends that the trial court abused its discretion in admitting the evidence that was found in plain view in the kitchen following the Detectives' warrantless entry into the home. In raising the contention, Bradley argues that admission of the challenged evidence was improper under both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Specifically, Bradley argues that (1) Beatty did not have

the authority to consent to the Detectives' entry into the home and (2) the Detectives did not have a reasonable concern for their safety before completing the protective sweep of the kitchen. The State, for its part, argues that the evidence was admissible because Beatty had the apparent authority to, and did, consent to the Detectives' entry into the home. The State also argues that the Detectives had a reasonable concern for their safety, which justified the protective sweep of the kitchen.

## A. Standard of Review

Our standard of review for rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by an objection at trial. *Ackerman v. State*, 774 N.E.2d 970, 974-75 (Ind. Ct. App. 2002), *trans. denied*. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. We also consider uncontroverted evidence in the defendant's favor. *Id.*

A trial court has broad discretion in ruling on the admissibility of evidence. *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003) (citing *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind. Ct. App. 2001)). Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* (citing *Bradshaw*, 759 N.E.2d at 273). An abuse of discretion involves a decision that is clearly against the logic and effect of the

facts and circumstances before the court. *Id*. (citing *Huffines v. State*, 739 N.E.2d 1093, 1095 (Ind. Ct. App. 2000)).

## B. The Fourth Amendment

### 1. *Warrantless Entry into Home*

[26] On appeal, Bradley claims that the warrantless entry into the home by the Detectives violated the Fourth Amendment to the United States Constitution. "The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010) (internal citations omitted). "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

[27] However, "'[t]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.'" *Gado v. State*, 882 N.E.2d 827, 831 (Ind. Ct. App. 2008) (citing *Georgia v. Randolph*, 547 U.S. 103, 106 (2006)). "Authority to consent to a search can be either apparent or actual." *Id*. "Actual authority requires a sufficient relationship to or mutual use of the property by persons generally having joint access to or control of the property for most purposes." *Id*. at 832

(citing *Halsema v. State*, 823 N.E.2d 668, 677 (Ind. 2005)). If actual authority cannot be shown, one must determine whether the consenting party had apparent authority to consent to the search.

[28] "Under the apparent authority doctrine, a search is lawful if the facts available to the officer at the time would cause a person of reasonable caution to believe that the consenting party had authority over the premises." *Primus v. State*, 813 N.E.2d 370, 374-75 (Ind. Ct. App. 2004) (citing *Rodriguez*, 497 U.S. at 181; *Trowbridge v. State*, 717 N.E.2d 138, 144 (Ind. 1999)).

> As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a person of reasonable caution in the belief that the consenting party had authority over the premises. [*Rodriguez*, 497 U.S. at 188]. If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. *Id*. But if so, the search is valid. *Id*.

*Id*. at 375. The State bears the burden of proving that the third party possessed the authority to consent. *Id*. at 375.

[29] In the instant matter, the record demonstrates that in conducting surveillance of the home prior to January 15, 2013, Detectives Campbell and McCoy had observed both Bradley and Beatty arrive at and enter the home. An attempt to determine who resided at the home was unsuccessful. Although the Detectives may not have known who resided at the home when they were conducting surveillance on the home on January 15, 2015, the Detectives' prior

observations at the home reasonably indicated that Beatty had an affiliation with the home.

[30] Again, while conducting surveillance on the home on January 15, 2013, the Detectives watched Beatty approach the home and knock on the front door. Almost immediately after Beatty knocked on the front door, someone from inside the home opened the door so that Beatty could enter. The Detectives waited a few minutes after Beatty entered the home before approaching the home and knocking on the front door. After Detective McCoy knocked on the front door, Beatty opened the door.[2] Detective McCoy identified himself and Detectives Campbell and Lomax, explained that they had come to the home because of a narcotics complaint, and requested permission for the Detectives to step inside the home. Beatty verbally consented to the Detectives' entry into the home and stepped to the side to allow the Detectives to enter.

[31] It is important to note that Beatty did not indicate that he did not reside at the home or was a guest at the home. Likewise, Beatty did not indicate that he could not consent to the Detectives' entry. Instead, Beatty acted as though he had the authority to decide who could or could not enter the home.

---

[2] We cannot agree with Bradley's assertion that the fact that Beatty knocked on the door before entering the home was enough, in and of itself, to prove that Beatty did not have the apparent authority to consent to the Detectives' entry into the home. As the State pointed out in its appellate brief, there could be any number of valid reasons why a resident of a home might knock before entering a home.

[32]     In light of Beatty's actions upon opening the door coupled with the Detectives' prior observations, we conclude that a person of reasonable caution would have been warranted in believing that Beatty had authority over the home and, as a result, could consent to the Detectives' entry into said home. The trial court reasonably determined that Beatty validly consented to the Detectives' entry into the home. The Detectives' warrantless entry into the home, therefore, did not violate the Fourth Amendment.

## 2. Protective Sweep of the Kitchen

[33]     Bradley further claims that even if Beatty did have the apparent authority to consent to the Detectives' entry into the home, the evidence discovered in plain view during the Detectives' protective sweep of the kitchen was not admissible because the Detectives' protective sweep was unjustified.

> In *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court applied the Fourth Amendment reasonableness test and permitted a limited warrantless search, or protective sweep, in a home by officers who were executing an arrest warrant inside the home and who had a reasonable suspicion that an individual posing a threat to the officers was present elsewhere on the premises. *Id.* at 334, 110 S. Ct. 1093. The Supreme Court explained that the Fourth Amendment did not prohibit the officers from "tak[ing] reasonable steps to ensure their safety after, and while making, the arrest." *Id.* Accordingly, the officers could search beyond the area immediately adjoining the place of arrest if they had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

*U.S. v. Miller*, 430 F.3d 93, 97-98 (2d Cir. 2005) (brackets in original).

[34]     In *Weddle v. State*, 989 N.E.2d 371, 377 (Ind. Ct. App. 2013), we concluded that a protective sweep of the defendant's residence was justified because the police officers searched only adjoining rooms from which an attack could immediately occur. In another case, *Cudworth v. State*, 818 N.E.2d 133, 138 (Ind. Ct. App. 2004), a panel of this court concluded that officers could not complete a protective sweep of a home when they did not enter the resident incident to the defendant's arrest. However, given the facts of the instant matter, we decline to follow this conclusion because we believe that it overlooks the need for officers who are lawfully in a home for reasons other than for effectuating an arrest, but have a legitimate concern for their safety, to take the steps necessary to ensure their safety while in the home.

[35]     Instead, we agree with the conclusion of the United States Court of Appeals for the Second Circuit that a law enforcement officer present in a home under lawful process may conduct a protective sweep when the officer possesses "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the … scene.'" *Miller*, 430 F.3d at 98 (quoting *Buie*, 494 U.S. at 334); *see also U.S. v. Taylor*, 248 F.3d 506, 513-14 (6th Cir. 2001) (providing that the court found that it follows logically that the principle enunciated in *Buie* with regard to officers making an arrest-that the police may conduct a limited protective sweep to ensure the safety of those officers-applies with equal force to other situations where an

officer has lawfully entered a premises without a warrant). Like the Courts in *Miller* and *Taylor*, we emphasize, however, that the purpose of such a protective sweep is to protect the safety of the law enforcement officers, and for that reason, the sweep must be limited to a cursory search of the premises for the purpose of finding persons hidden there who would threaten the officers' safety. *See Miller*, 430 F.3d at 100; *Taylor*, 248 F.3d at 513-14.

[36] Upon entering the home, Detective McCoy asked Beatty if anyone else was in the home. Beatty responded that there was not. However, within seconds of Beatty indicating that there was no one else in the home, the Detectives observed a black male "peak [sic]" his head around the kitchen corner. Tr. p. 152. The black male retreated after seeing the Detectives. Because the Detectives could not see into the kitchen, Detective McCoy ordered the individual in the kitchen to come into the living room. The individual did not comply with Detective McCoy's order. After the individual in the kitchen failed to comply with Detective McCoy's order, Detectives McCoy and Lomax, out of concern for their and Detective Campbell's safety, conducted the protective sweep of the kitchen.

[37] The Detectives also had reason to be concerned that there may be weapons in a home in which believed drug activity occurred. Again, Detectives Campbell and McCoy started conducting surveillance on the home after Detective Campbell received an anonymous complaint alleging that drug dealing was occurring at the home. During their surveillance of the home prior to January 15, 2013, Detectives Campbell and McCoy had observed heavy foot traffic in

and out of the home with the visitors "going inside, staying for [a] very short amount of time and leaving." Tr. p. 37. In their experience as law enforcement officers, Detectives Campbell and McCoy knew that such activity was indicative of the sale of drugs. It was reasonable for the Detectives to be concerned that individuals involved with the manufacture or sale of drugs might be armed, as we have previously acknowledged that it is not uncommon for individuals involved with the manufacture or sale of drugs to carry weapons. *See generally, Swanson v. State*, 730 N.E.2d 205, 211 (Ind. Ct. App. 2000) (acknowledging that it is not uncommon for drug dealers to carry weapons), *trans. denied*.

[38] Based on these circumstances, we believe it was reasonable for the Detectives to conduct a protective sweep of the kitchen. Again, Beatty had just lied to Detective McCoy by stating that there was no one else in the home. The Detectives knew that Beatty's statement was false because they observed a male "peak [sic]" his head around the kitchen corner before retreating into the kitchen. Tr. p. 152. The Detectives could not see into the kitchen from the living room and, could not determine whether the male in the kitchen was armed or posed a threat to their safety without completing a protective sweep of the kitchen. As such, we conclude that the Detectives' protective sweep of the kitchen was justified.

# C. Article I, Section 11

## 1. *Warrantless Entry into Home*

[39] Bradley also claims that the warrantless entry into the home by the Detectives violated Article I, Section 11 of the Indiana Constitution. Article I, Section 11 reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"Although this language tracks the Fourth Amendment verbatim, we proceed somewhat differently when analyzing the language under the Indiana Constitution than when considering the same language under the Federal Constitution." *Trimble v. State*, 842 N.E.2d 798, 803 (Ind. 2006). "Instead of focusing on the defendant's reasonable expectation of privacy, we focus on the actions of the police officer, concluding that the search is legitimate where it is reasonable given the totality of the circumstances." *Id.* We will consider the following factors in assessing reasonableness: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

As we concluded above, Beatty had the apparent authority to and did, in fact, consent to the Detectives' entry into the home. As such, because the focus of the exclusionary rule is the reasonableness of police conduct, we conclude that the Detectives' reliance on Beatty's consent was completely reasonable. *See Lee v. State*, 849 N.E.2d 602, 610 (Ind. 2006) (providing that because the focus of the exclusionary rule is the reasonableness of police conduct, the Indiana Supreme Court found that the police reliance on defendant's fiancée's apparent authority over the evidence in question to be reasonable). We therefore conclude that the Detectives' entry into the home did not violate the Indiana Constitution's prohibition against unreasonable search and seizure.

### 2. Protective Sweep of the Kitchen

Alternatively, Bradley claims that even if the Detectives' reliance on Beatty's consent to enter the home was reasonable, their protective sweep of the kitchen was unreasonable. Again, in considering claims under Article I, Section 11, we focus on the actions of the police officers to determine whether the search was reasonable under the totality of the circumstances. *See Trimble*, 842 N.E.2d at 803. In considering on the reasonableness of the actions of the police officers involved, we consider: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield*, 824 N.E.2d at 361.

Despite Bradley's claim to the contrary, we conclude that the Detectives' protective sweep of the kitchen was reasonable under the totality of the

circumstances. The Detectives had a high degree of concern for their safety. Again, the Detectives knew that Beatty had lied about being the only individual present in the home. The Detectives knew that there was an unknown individual in the kitchen and that the individual in the kitchen did not comply with Detective McCoy's order to come into the living room. The Detectives, however, could not see into the kitchen to verify whether the individual was armed or otherwise posed a threat to their safety. Also, we do not believe that the additional intrusion of the Detectives conducting a protective sweep of the kitchen, a common area within the home, was significant considering that Beatty had already given the Detectives permission to enter the home. Additionally, the Detectives' needs were substantial as it is reasonable to assume that the Detectives felt the need to verify their personal safety before continuing with their investigation of potential drug activity inside the home. These factors indicate that the Detectives' protective sweep of the kitchen was reasonable.

## D. Trial Court Did Not Abuse Its Discretion in Admitting the Challenged Evidence

[43] Because we conclude that Beatty had the apparent authority to consent to the Detectives' entry into the home and that the Detectives' protective sweep of the kitchen was justified in light of legitimate concerns for the Detectives' safety, we conclude that the Detectives entry into the home and protective sweep of the kitchen did not violate either the Fourth Amendment or Article I, Section 11. As such, we further conclude that the trial court did not abuse its discretion in

admitting the evidence that was found in plain view during the Detectives' protective sweep of the kitchen.

# II. Double Jeopardy

Bradley also contends that his convictions for Class A felony possession of cocaine, Class C felony possession of cocaine and a handgun, and Class C felony possession of cocaine violate the constitutional prohibitions against double jeopardy.

# A. Applicable Authority

> The Indiana Double Jeopardy Clause provides, "No person shall be put in jeopardy twice for the same offense." Ind. Const. art. I, § 14. We analyze alleged violations of this clause pursuant to our Supreme Court's opinion in *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999). In *Richardson*, our Supreme Court held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." 717 N.E.2d 32, 49 (Ind. 1999) (emphasis in original).

*Bunch v. State*, 937 N.E.2d 839, 845 (Ind. Ct. App. 2010).

Under the "statutory elements" test, two or more offenses are the same offense in violation of Article I, Section 14 of the Indiana Constitution if the essential statutory elements of one of the challenged offenses also establishes the essential statutory elements of another challenged offense. *See id*. (citing *Richardson*, 717 N.E.2d at 49).

Under the "actual evidence" test, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish all of the essential elements of a second challenged offense. *Id.* (citing *Richardson*, 717 N.E.2d at 53). Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the fact-finder's perspective. *Id.* at 845-46. The term "reasonable possibility" "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Id.* at 846.

> The language expressing the actual evidence test explicitly requires evaluation of whether the evidentiary facts used to establish the essential elements of one offense may also have been used to establish *the essential elements* of a second challenged offense. The test is not merely whether the evidentiary facts used to establish *one* of the essential elements of one offense may also have been used to establish *one* of the essential elements of a second challenged offense. In other words, under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

*Spivey v. State*, 761 N.E.2d 831, 832-33 (Ind. 2002) (emphases in original).

## B. Whether Bradley's Convictions for Class A Felony Possession of Cocaine, Class C Felony Possession of Cocaine and a Firearm, and Class C Felony Cocaine Violated the Prohibitions Against Double Jeopardy

[48] Initially, we note that the State concedes that Bradley's conviction for Class C felony possession of cocaine violates the prohibitions against double jeopardy and, therefore, must be vacated. Because the State does not differentiate between the cocaine possessed in either offense and the record does not demonstrate possession of independent sources of cocaine for the two offenses, we agree that Bradley's convictions for both Class A felony possession of cocaine and Class C felony possession of cocaine violate the prohibitions against double jeopardy. We therefore turn our attention to whether Bradley's convictions for both Class A felony possession of cocaine and Class C felony possession of cocaine and a firearm violate the prohibitions against double jeopardy.

[49] Again, in order to convict Bradley of Class A felony possession of cocaine, the State was required to prove that Bradley possessed more than three grams of cocaine with the intent to deliver. Ind. Code §35-48-4-1(a) & (b). Likewise, in order to convict Bradley of Class C felony possession of cocaine and a handgun, the State was required to prove that Bradley possessed cocaine while also in possession of a firearm. An essential element of both of these offenses is undoubtedly the possession of cocaine.

[50] Bradley contends that his convictions for both Class A felony possession of cocaine and Class C felony possession of cocaine and a firearm violate the prohibitions against double jeopardy because the same cocaine was used to support both convictions. The State counters Bradley's contention by arguing solely that Bradley's convictions for Class A felony possession of cocaine and Class C felony possession of cocaine and a firearm do not violate the prohibitions against double jeopardy because the convictions are supported by two separate independent sources of cocaine. Specifically, the State claims that the Class A felony possession conviction is supported by the approximately thirty grams of cocaine that was recovered from Bradley's person and the Class C felony possession conviction is supported by the "very small amount of cocaine," tr. p. 181, that was found in plain sight on the kitchen counter.

[51] In considering Bradley's claim, we find it important that the State does not differentiate between the sources of cocaine in charging Bradley. The charging information for each count merely alleges that Bradley possessed cocaine. Moreover, the State did not differentiate between the cocaine recovered from Bradley's person and the small amount of cocaine discovered in plain view during the Detective's protective sweep of the home as being derived from separate independent sources during its arguments to the court. Rather, the State seems to have treated all of the cocaine as one large sum of cocaine.

[52] In light of the State's failure to differentiate between the alleged independent sources of cocaine in either the charging information or its argument before the trial court, we conclude that the cocaine recovered from Bradley's person and

the "very small amount of cocaine," tr. p. 181, discovered in plain view during the Detectives' protective sweep of the home must be treated as a single source of cocaine. As such, we conclude that Bradley's conviction for Class C felony possession of cocaine and a firearm is barred by the prohibitions against double jeopardy because the same cocaine was used to support both that conviction and Bradley's conviction for Class A felony possession of cocaine. *See Bennett v. State*, 5 N.E.3d 498, 515 (Ind. Ct. App. 2014) (providing that a defendant cannot be convicted of dealing in cocaine and possession of cocaine when the same cocaine was used to support both convictions); *see also Harrison v. State*, 901 N.E.2d 635, 643-44 (Ind. Ct. App. 2009) (also providing that a defendant cannot be convicted of dealing in cocaine and possession of cocaine when the same cocaine was used to support both convictions), *trans. denied*.

[53] Additionally, we note that the Indiana Supreme Court has previously concluded that "the crime of Class C felony possession of cocaine and a firearm is a lesser included offense" of Class A felony possession or dealing. *Hardister v. State*, 849 N.E.2d 563, 575 (Ind. 2006). Thus, considering the Indiana Supreme Court's conclusion in *Hardister* coupled with our conclusion that the same cocaine was used to support both of the relevant convictions, we further conclude that Bradley's conviction for Class C felony possession of cocaine and a firearm must therefore be vacated.

# III. Sufficiency of the Evidence

[54] Bradley also contends that the evidence is insufficient to sustain his convictions for Class A felony possession of cocaine, Class C felony possession of cocaine and a firearm, and Class A misdemeanor possession of marijuana.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict could be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

## A. Class A Felony Possession of Cocaine

[55]  Bradley first claims that the evidence is insufficient to sustain his conviction for Class A felony possession of cocaine. The version of Indiana Code section 35-48-4-1(a) which was in effect on January 15, 2013, provides that: "[a] person who … (2) possesses, with intent to: … (C) deliver … cocaine or a narcotic drug, pure or adulterated … commits dealing in cocaine or a narcotic drug, a Class B felony." However, "[t]he offense is a Class A felony if: (1) the amount of the drug involved weighs three (3) grams or more." Ind. Code § 35-48-4-1(b). "The State must prove that appellant had the intent to deliver in order to gain a conviction of possession of cocaine with intent to deliver." *Chandler v. State*, 581 N.E.2d 1233, 1237 (Ind. 1991). "Because intent is a mental state, and because it is often the case that an actor does not verbally express intent, the trier of fact must usually resort to reasonable inferences based on examination of the surrounding circumstances to determine the existence of the requisite intent." *Id*. "Circumstantial evidence of intent to deliver, such as possession of a large quantity of drugs, large amounts of currency, scales, plastic bags, and other paraphernalia as well as evidence of other drug transactions, can support a conviction." *McGuire v. State*, 613 N.E.2d 861, 864 (Ind. Ct. App. 1993).

[56]  In the instant matter, the admissible circumstantial evidence is sufficient to sustain the trial court's determination that the State proved that Bradley possessed cocaine with the intent to deliver said cocaine. When the Detectives encountered Bradley, Bradley had a large quantity of cocaine on his person, approximately thirty grams. The majority of the cocaine was in a large baggie.

A much smaller portion was in a separate package. Bradley also had a large amount of United States currency on his person. In addition, a set of digital scales, a small piece of crack cocaine, glass jar containing cocaine residue, and a cutting agent were found in plain view in the kitchen during the Detective's protective sweep of the home. Further, Detective McCoy testified that, based on his experience as a law enforcement officer, such a large quantity of cocaine coupled with the large amount of United States currency and the items found in plain view of the kitchen, was indicative of dealing rather than personal use. In light of the evidence presented at trial considered with Detective McCoy's testimony, we conclude that the evidence is sufficient to sustain Bradley's conviction for Class A felony possession of cocaine.

## B. Class C Felony Possession of Cocaine and a Firearm

[57] Bradley next claims that the evidence is insufficient to sustain his conviction for Class C felony possession of cocaine and a firearm. However, having concluded above that this conviction must be vacated due to double jeopardy concerns, we need not consider whether the evidence is sufficient to sustain this conviction.

## C. Class A Misdemeanor Possession of Marijuana

[58] Bradley last claims that the evidence is insufficient to sustain his conviction for Class A misdemeanor possession of marijuana. The version of Indiana Code section 35-48-4-11 which was in effect on January 15, 2013, provides that: "[a] person who … knowingly or intentionally possesses (pure or adulterated)

marijuana … commits possession of marijuana … a Class A misdemeanor." "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a).

[59] Here, the Detectives recovered marijuana from Beatty's person and from a kitchen cabinet. The records suggest that the marijuana recovered from the kitchen cabinet was not found in plain view when the Detectives conducted their protective sweep of the kitchen. Specifically, none of the Detectives testified that the marijuana recovered from the kitchen cabinet was found in plain view. Although the trial court's ruling regarding suppression of the evidence is not clear as to the marijuana recovered from the kitchen cabinet specifically, the trial court's order indicates that only the evidence that was found in the Detectives' plain view when they completed the protective sweep of the kitchen, the handgun, and the evidence recovered from Bradley's person was admissible at trial. Because the Detectives' testimony leads only to the reasonable inference that the marijuana was not found in plain view but rather was recovered from inside the kitchen cabinet, we conclude that the marijuana was, or should have been, excluded from trial.

[60] Further, the State does not argue, and we do not believe, that the marijuana recovered from Beatty's person can or should be attributed to Bradley. As such, we conclude that the evidence is insufficient to sustain Bradley's conviction for Class A misdemeanor possession of marijuana because the only evidence of

marijuana possession that could possibly be attributed to Bradley was not found in plain sight and therefore was, or should have been, excluded from trial. Bradley's conviction for Class A misdemeanor possession of marijuana must therefore be vacated.

## Conclusion

In sum, we conclude (1) that the Detectives entry into the home did not violate the Fourth Amendment or Article I, Section 11; (2) that the Detective's protective sweep of the kitchen did not violate the Fourth Amendment or Article I, Section 11; (3) that Bradley's convictions for Class C felony possession of cocaine and a handgun and Class C felony possession of cocaine violated the prohibitions against double jeopardy and therefore must be vacated; (4) that the evidence is sufficient to sustain Bradley's conviction for Class A felony possession of cocaine; and (5) that the evidence is insufficient to sustain Bradley's conviction for Class A misdemeanor possession of marijuana.

We therefore (1) affirm Bradley's conviction for Class A felony possession of cocaine; (2) vacate Bradley's convictions for Class C felony possession of cocaine and a handgun, Class C felony possession of cocaine, and Class A misdemeanor possession of marijuana; and (3) remand the matter to the trial court with instructions for the trial court to enter a new judgment of conviction that is consistent with this opinion.

[63] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

May, J., and Crone, J., concur.